UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Nathan Pardi,

       Plaintiff,

v.

Wayne, County of, et al.,

       Defendants.

_____/

Case No. 12-12063

Honorable Nancy G. Edmunds

## ORDER AND OPINION GRANTING DEFENDANTS WAYNE COUNTY, CATHLEEN JANSEN, HARNETHA JARRET, AND MICHAEL GRUNDY (IN HIS OFFICIAL CAPACITY)'S MOTION TO DISMISS [36] AND GRANTING DEFENDANT GRUNDY (IN HIS INDIVIDUAL CAPACITY)'S MOTION TO DISMISS [32]

Plaintiff Nathan Pardi has filed First Amendment retaliation, Michigan Whistleblowers' Protection Act, and civil conspiracy claims against his former employer and several of his former employer's employees. (Dkt. 1.) Plaintiff, a former senior attorney in the Wayne County Corporation Counsel's office, brings his claims against Defendants Wayne County, Michael Grundy, a former appointed Assistant County Executive of Wayne County, Cathleen Jansen, the appointed Acting Principal Attorney employed by the Wayne County Corporation Counsel's Office of Wayne County, and Harnetha Jarret, the appointed Deputy Corporation Counsel employed by the Wayne County Corporation Counsel's office of Wayne County.   (Am. Compl. ¶¶ 5-7.)

Before the Court are Defendants Wayne County, Cathleen Jansen, Harnetha Jarret, and Michael Grundy (in his official capacity)'s motion to dismiss on the pleadings and Defendant Grundy (in his individual capacity)'s motion to dismiss.[1]  (Dkt. 36, 32.)

## I.    Facts

At the relevant times, Plaintiff was an Attorney IV, a Senior Attorney in the Wayne County Corporation Counsel's office.  (Am. Compl. ¶ 8.)  He had been employed by Defendant for twenty-five years when the incidents prompting this lawsuit allegedly occurred.  (*Id.*)  He states that, prior to 2011, he had never been disciplined.

Beginning in September, 2011, Plaintiff maintains that he was disciplined three times.  The disciplines were all related, he alleges, to the work he was assigned to at the time, the Patient Care Management System (PCMS) and HealthChoice of Michigan Program (HealthChoice).  Plaintiff does not state what he actually did for these clients.  Plaintiff maintains, though, that he clashed several times with Defendant Michael Grundy, the then-appointed Assistant County Executive of Wayne County, over the management of these clients.  The Amended Complaint does not offer much in the way of background as to what Plaintiff did with these clients and with what exactly Defendant Grundy took issue.

Plaintiff states that he was first disciplined on September 8, 2011.  (Am. Compl. ¶ 10.)  Plaintiff alleges that the discipline was due to the insistence by Defendant Grundy that Plaintiff be removed from his duties associated with his assignment at PCMS and HealthChoice. (*Id.*)

---

[1]"Defendants" refers to the Wayne County Defendants:  Wayne County, Cathleen Jansen, Harnetha Jarret, and Michael Grundy (in his official capacity).

His second discipline arose from an interaction he had on December 6, 2011.  He stated that, on that day, "at the direct order of Cathleen Jansen, his then superior at the Wayne County Corporation Counsel, and the request of his client, the Director of PCMS he spoke with "Charlie LeDuff, Fox News Detroit, as it relate[d] to LeDuff's investigation of alleged wrongdoing by Defendant[] Michael Grundy and his association with the Wayne County Patient Care Management System and Healthchoice of Michigan[.]" (Am. Compl. ¶ 9.)

Three days later, on December 9, 2011, Plaintiff states that Defendants disciplined Plaintiff.  (Am. Compl. ¶ 10.)  One of the reasons for this discipline, Plaintiff alleges, "was because of his interview with Charlie LeDuff on a matter of public concern and because of his speech on December 6, 2011."  (*Id.*)  Plaintiff alleges that Defendants Jarrett and Jansen disciplined Plaintiff "for matters directly associated with his work relating to Healthchoice contract approval"  "in an effort to force Plaintiff to retire."  (Am. Compl. ¶ 11.)

The next discipline arose from a meeting that occurred on January 26, 2012.  (Am. Compl. ¶ 15.)  Plaintiff states that his WPA claim arises from this meeting. On that date, Plaintiff states that he, as part of his official duties, attended a meeting at the Board of Trustees of HealthChoice of Michigan meeting.  (*Id.*)  Plaintiff represents that Defendant Cathleen Jansen was present.  (*Id.* ¶ 16.)  At the meeting, Plaintiff states that he "objected to and otherwise challenged the action of the Healthchoice of Michigan Board of Directors in improperly and illegally transferring $470,500.00 from Healthchoice of Michigan accounts to the Wayne County Health Department, in specific contravention of the Intergovernmental Agreement (IGA) which allocated 3.5% annually to Wayne County as  reimbursement for operating costs, a total of $249,000, not the $719,500 allegedly approved by Michael

Grundy and Edith Killins, Wayne County Health Department Director, which was not supported in writing or by way of written agreement or amendment of the IGA referenced herein the Healthchoice trust fund to Wayne County." (*Id.* ¶ 17.) Plaintiff adds that he "immediately advised Jansen, Christopher Johnson, HealthChoice Director, as well as other Wayne County employees, attorneys and appointees, and other members of the Corporation Counsel's office that said action was illegal." (*Id.*)

Plaintiff states that he said that, if the matter was not brought to the attention of the appropriate county officials, "he would have to make a formal written report to the HealthChoice Board of Directors and local news affiliates, including Charlie LeDuff." (Am. Compl. ¶ 18.)

Plaintiff implies that, after his statement, he was disciplined a third time when he "was advised of his previous disciplines and that he could be terminated if he received additional discipline." (Am. Compl. ¶ 19.)

On February 28, 2012, Plaintiff, then 62 years old, states that he applied for his pension, despite his desire to work for Defendant until he reached the age of 65, "in order that he not be fired and then barred from requesting his pension benefits upon reaching the age of 65." (Am. Compl. ¶ 20.) Plaintiff represents that, after he questioned the transfer of money, "his treatment and his relationship with the management of the Defendant Wayne County, including Defendant supervisor changed for the worse." (*Id.*)

Plaintiff then alleges a civil conspiracy count against Defendants. He states that they "illegally, maliciously and wrongfully conspired with one another with the intent to and for the illegal purpose of covering up and hiding from the public certain wrongful acts of Defendant[] Michael Grundy and other executive employees of Wayne County associated

4

with the Healthchoice program and the transfer of funds from Healthchoice program to the mental health budget." (Am. Compl. ¶ 27.) Plaintiff adds that Defendants "conspired to intimidate Plaintiff from pressing and otherwise moving forward with his claims of unlawful conduct by Defendant Grundy and other county executives as it relate[d] to the misuse, misappropriation and other acts of malfeasance, nonfeasance and misfeasance by county executive employees." (*Id.* ¶ 28.)

Plaintiff explains that, in July, August, and September, 2011, Defendant Grundy ordered Plaintiff to create several non-profit corporations. (Am. Compl. ¶ 30.) Plaintiff states that he refused to do so. (*Id.*) Plaintiff maintains that Defendant Grundy requested Plaintiff to create these non-profit corporations "for reasons other than conducting [] HealthChoice [,] which was controlled by and managed by the Wayne County Executive and Wayne County Board of Directors pursuant to the Wayne County Charter." (*Id.* ¶ 30.) Plaintiff states that he refused to establish these corporations and that Defendant Grundy "contacted Plaintiff's immediate supervisors and advised Defendants Cathleen C. Jansen and/or Harnetha Jarrett that Plaintiff must be disciplined and removed as the attorney for HealthChoice because of his refusal to engage in the illegal activities[.]" (*Id.* ¶ 31.) Plaintiff then states that, "[a]s part of the conspiracy and in furtherance of [it], Defendants Jansen and Jarrett, in order to give legitimacy to the transfer of Plaintiff from HealthChoice back to the corporation counsel's office[,] implemented disciplinary proceedings against Plaintiff, at the direction and approval of Defendant Grundy[.]" (*Id.* ¶ 32.)

## II.   Standards

### A.   12(c) standard

5

At any time after the pleadings close, but before trial commences, a party may move for a judgment on the pleadings. *See* Fed. R. Civ. P. 12(c). The standard of review is the same *de novo* standard applicable to a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6). *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001).

The Court reviews the motion in a light most favorable to the plaintiff, assumes that the plaintiff's factual allegations are true, and determines whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Id.* This standard of review "'requires more than the bare assertion of legal conclusions.'" *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)). The Court need not accept as true legal conclusions or unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

If the court, however, considers matters outside the pleadings, it must treat the motion as one for summary judgment pursuant to Fed. R. Civ. P. 56. *See Rubin v. Schottenstein, Zox, & Dunn*, 110 F.3d 1247, 1253 (6th Cir. 1997).[2]

### B.    Rule 12(b)(6) Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. In a light most favorable to the plaintiff, the court must assume that the plaintiff's factual allegations are true and determine whether the complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996). To survive a Rule 12(b)(6) motion to dismiss, the

---

[2]Although Plaintiff has submitted an affidavit and other documents, the Court does not consider these exhibits on this motion to dismiss.

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis omitted).  *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).

"[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 679 (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.*

> Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.

*Id.* (internal quotation marks and citation omitted).  Thus:

> A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 678 (internal quotation marks and citation omitted).

## III.   Analysis

### A.   First Amendment retaliation

Plaintiff alleges that Defendants violated his First Amendment rights when they allegedly terminated him based on comments he made when they ordered him to speak with a media reporter.

Defendants argue that dismissal of the First Amendment retaliation claim is appropriate for three reasons. Defendants first argue that Plaintiff's retaliation claim fails because Plaintiff's alleged protected speech was not made as a private citizen but rather was made as a function of his job, rendering the speech not protected and not actionable by a First Amendment retaliation claim. (Defs.' Mot. at iv.) Defendants then argue that the claim also fails because Plaintiff voluntarily retired and that he therefore cannot establish a retaliatory adverse action. (*Id.*) Defendants finally argue that Plaintiff fails to state a claim because he has not alleged a that any adverse action was the result of a municipal policy or custom. (*Id.*)

The Court finds that the first argument that Defendants raise is dispositive. The Court nonetheless addresses the adverse action argument, finding it dispositive as well.

To state a First Amendment retaliation claim, a plaintiff must allege that: (1) he engaged in constitutionally protected conduct: (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct;

8

and (3) the adverse action was motivated at least in part by his protected conduct. *Mosholder v. Barnhardt*, 679 F.3d 443, 449 (6th Cir. 2012) (citation omitted).

In a government setting involving a government employee plaintiff, a First Amendment retaliation claim is somewhat narrower. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 539 (6th Cir. 2012) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 4118 (2006)). But public employees "do not forfeit all their First Amendment rights simply because they are employed by the state or a municipality." *Id.* (citation omitted). The First Amendment "protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern." *Id.* (citation omitted). "However, when a public employee speaks as an employee on matters of personal interest, 'a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). The principles are "meant to protect not only the constitutional rights of public employees but also 'the public's interest in receiving the well-informed views of government employees engaging in civic discussion.'" *Handy-Clay*, 695 F.3d at 540 (quoting *Garcetti*, 547 at 419).

In order for Plaintiff to establish that his speech was constitutionally protected he must show (1) that his speech was made as a private citizen, rather than pursuant to his official duties; (2) that his speech involved a matter of public concern; and (3) that his interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in promoting the efficiency of the public services it performs through its

9

employees." *Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 540 (6th Cir. 2012) (internal quotation marks and citation omitted).

### 1.    Plaintiff spoke as an employee, not as a citizen

Defendants first argue that the Court must dismiss Plaintiff's claim because he admits in his verified complaint that he was not speaking as a private citizen, "but rather . . . in his role as Senior Attorney for Wayne County." (Defs.' Mot. at 6.)

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Handy-Clay*, 695 F.3d at 540 (quoting *Garcetti*, 547 U.S. at 421.). The Supreme Court has explained:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* (quoting *Garcetti*, 547 U.S. at 421-22). Courts therefore "look to the content and context of the plaintiff's speech to determine whether her statements were made pursuant merely to her professional duties." *Id.* (citation omitted).

The Sixth Circuit has listed factors to consider in making the determination: the impetus of the speech; the setting of the speech; the speech's audience; and its general subject matter. *Handy-Clay*, 695 F.3d at 540 (citation omitted). Other considerations include whether the statements were made to individuals "up the chain of command," and whether the content of the speech is "nothing more than 'the quintessential employee beef: management has acted incompetently.'" *Id.* (quotation marks and citations omitted). Other non-dispositive factors "include whether the speech was made inside or outside of the

10

workplace and whether it concerned the subject-matter of the speaker's employment." *Id.*
at 540-41 (citations omitted).

In his complaint, Plaintiff states:

On or about December 6, 2011, Plaintiff engaged in constitutionally protected speech on a matter of public concern by talking to Charlie LeDuff, Fox News Detroit, as it relate[d] to LeDuff's investigation of alleged wrongdoing by Defendant[] Michael Grundy and his association with the Wayne County "Patient Care Management System and Healthchoice of Michigan, at the direct order of Cathleen Jansen, his then superior at the Wayne County Corporation Counsel, and the request of his client, the Director of the Wayne County Patient Care Management Systems (PCMS).

(Pl.'s Am. Compl. ¶ 9.)

Defendants point to *Garcetti v. Ceballos*, 547 U.S. 410 (2006), arguing that *Garcetti*'s facts are analogous to this case's and therefore that the Court must dismiss the retaliation claim. (Defs.' Mot. at 6-7.) In *Garcetti*, the plaintiff, Ceballos, was a calendar deputy in the Los Angeles County District Attorney's Office. *Id.* at 413. Ceballos's duties involved exercising some supervisory responsibility over other lawyers. *Id.* The controversy arose when a defense attorney contacted Ceballos about a criminal case and expressed a concern that an affidavit that was used to obtain a "critical search warrant" contained inaccuracies. *Id.* The defense attorney asked Ceballos to review the case. *Id.* Ceballos stated that "it was not unusual for defense attorneys to ask calendar deputies to investigate aspects of pending cases." *Id.* at 414. Ceballos stated that he researched the allegations in the affidavit and found that there were serious misrepresentations in it. *Id.* After further research, Ceballos reported his findings to his supervisors and then followed the oral report with a written disposition memorandum. *Id.* In the memorandum, Ceballos expressed his concerns and recommended dismissing the case. *Id.* The case went

11

forward, despite Ceballos's objections. *Id.* Ceballos was called at a hearing in which the affidavit was challenged. *Id.* at 414-15. After the affidavit issues, Ceballos claimed that "he was subjected to a series of retaliatory employment actions," including "reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse, and a denial of a promotion." *Id.* at 415. After unsuccessfully filing a grievance, Ceballos filed suit in federal court alleging that his employers violated his First and Fourteenth Amendment rights by retaliating against him based on his memorandum. *Id.* Ceballos was unsuccessful at the district court, but the Ninth Circuit reversed.

At the Supreme Court, the Court framed the issue as "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties. *Garcetti*, 547 U.S. at 413. The Court stated that the "controlling factor" in Ceballos's case was that "his expressions were made pursuant to his duties as a calendar deputy." *Id.* at 421. The Court held that the expressions and "the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case–distinguishes Ceballos['s] case from those in which the First Amendment provides protection against discipline." *Id.* Given that consideration, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

The Court reasoned that "Ceballos wrote his disposition memo because that [was] part of what he, as a calendar deputy, was employed to do." *Garcetti*, 547 U.S. at 421. The Court noted that it was "immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction."

*Id.*  The Court pointed out again that "[t]he significant point is that the memo was written pursuant to Ceballos['s] official duties."  *Id.*  The Court held that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."  *Id.* at 421-22.  This restriction, the Court stated "simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Id.* at 422.  The Court reasoned that Ceballos "did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings."  *Id.*  The Court simplified the matter: "[w]hen [Ceballos] went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee.  The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance."  *Id.*  The Court reasoned that "employees retain the prospect of constitutional protection for their contributions to the civic discourse[,]" but that the "prospect of protection, however, does not invest them with a right to perform their jobs however they see fit."  *Garcetti*, 547 U.S. at 422.  The Court found that reasoning afforded "government employers sufficient discretion to manage their operations," for

> [e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity.  Official communications have official consequences, creating a need for substantive consistency and clarity.  Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

*Id.* at 422-23.

13

In *Garcetti*, the Court addressed the issue of what constituted "the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. The Court stated that the "proper inquiry is a practical one," for "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424-25.

Defendants argue that here, as in *Garcetti*, Plaintiff made his alleged protected speech in his capacity as Senior Attorney for Wayne County, not as a private citizen. (Defs.' Mot. at 7.) Defendants maintain that Plaintiff admitted that his duties involved PCMS and HealthChoice, and that he spoke to the media about Defendant Grundy and Gruny's association with PCMS and HealthChoice, and that Cathleen Jansen, his then-direct supervisor, and PCMS asked him to speak to the media. (*Id.* at 7-8.) Given these representations, Defendants argue that Plaintiff's speech is not protected. (*Id.* at 8.)

Plaintiff argues that an issue exists for the jury: whether Plaintiff was "speaking to the reporter as part of his offical duties as set out in his job discription [sic]; or, was he speaking as a private citizen on a[n] issue of public concern[.]" (Pl.'s Resp. at 6.)

Plaintiff argues that his job duties did not include appearing on camera and making public comments to the news media. (Pl.'s Resp. at 7.) Plaintiff supports this argument with an affidavit he attaches to the response. Plaintiff states that it was not his responsibility to deal with the media, but rather the elected and appointed department heads and the county executive press secretary. (*Id.*) Plaintiff again represents in his brief

14

that "Plaintiff was given a direct order to make the statement and was punished for making said statement." (*Id.*)

Plaintiff then puts forth a standard of review argument. He argues that there is a circuit split as to whether the private citizen/public employee determination is an issue of fact or of law. (Pl.'s Resp. at 7.) But then Plaintiff goes on to say that the Sixth Circuit has found that the question is one of law. (*Id.*) Plaintiff is correct, the Sixth Circuit has decided the issue, and the question is one of law. *See Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350-51 (6th Cir. 2010)(citation omitted). Plaintiff therefore cannot successfully argue that the Court must apply a different standard.

Plaintiff frames the issue as "[c]an an employer force an employee to make a public statement to the news media and then discipline the employee for making the statements to the media?" (Pl.'s Resp. at 9.) Plaintiff continues:

> [i]t must be remembered that [Plaintiff's] statements were not scripted or prepared in advance. He was, in fact, giving his personal opinion as to the status of Grundy's alleged criminal activities and how those activities impacted county government. This was personal knowledge that [Plaintiff] spoke of and was not the official policy of Wayne County. [Plaintiff] was addressing issues of public corruption, the theft of governmental money and conspiracy on Grundy's part to allegedly steal public money. [Plaintiff's] comments were simply that the matter is under investigation and he had no comment to make.

(*Id.*)

*Weisbarth v. Geauga Park District*, 499 F.3d 538 (6th Cir. 2007) is illustrative. In *Weisberth*, the plaintiff, a park ranger, alleged that she was fired for comments she made to a third party consultant, who was hired by her department to ask all the employees about morale and performance issues. 499 F.3d at 542. The court, reviewing the appeal after a 12(b)(6) dismissal, accepted the plaintiff's allegation that her department "desired" the

15

consultant to ask, and the plaintiff to answer, the job-related questions. *Id*. at 543. The court addressed whether the plaintiff was speaking as a private citizen or a public employee at the time of the questioning. *Id*. The court held her speech was not protected because she was not speaking as a private citizen, following the reasoning set forth in *Garcetti*. *Id*. The court addressed the plaintiff's arguments that *Garcetti* did not apply. The plaintiff argued that speaking with the consultant was not within her "official duties" as a park ranger. *Id*. at 544. The court rejected her argument and stated that the plaintiff's conversation with the consultant was an 'ad-hoc' duty that arose in the course of her employment and that the speech "owe[d] its existence to [her] professional responsibilities". *Id*. (citation omitted) (second insertion in *Weisbarth*.). The plaintiff also argued that *Garcetti* was not persuasive because she was asked by her employer "to comment about the very matters that her speech addressed." *Id*. The court found that that direction from her employer actually worked against her case, for the "actions more closely linked to her official duties." *Id*. at 544-45.

The Sixth Circuit held that "*Garcetti* stands for the proposition that even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties." *Weisbarth*, 499 F.3d at 545. The court discussed that "the content of an employee's speech–though not determinative–will inform the threshold inquiry of whether the speech was, in fact, made pursuant to the employee's official duties." *Id*. (citations omitted).

The *Weisbarth* court, applying *Garcetti*, reasoned that the park ranger department hired the consultant "for legitimate departmental business, and the topics about which he questioned [the plaintiff]–employee morale and performance–obviously concerned her day-

16

to-day official duties" and therefore her speech was made as a public employee, not as a private citizen.  499 F.3d at 545.  The court recognized that the result may appear "highly illogical or unfair," but noted that "the relevant question is whether the firing violated her free-speech under the First Amendment," not logic or fairness.  *Id.*  "Thus, although taking action against a public employee for speech made pursuant to official duties might give rise to antidiscrimination, whistleblower, or labor-contract claims, it does not violate the First Amendment."  *Id.*

Here, Plaintiff cannot escape his representation in his complaint that Defendants, his employers, ordered him to speak to the media.  He therefore spoke not as a private citizen, but as a government public employee.  While Plaintiff argues that speaking to the media fell outside of his job description, the Court does not find that argument persuasive. *See Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) ("[S]peech by a public employee made pursuant to *ad hoc* or *de facto* duties not appearing in any written job description is nevertheless not protected if it 'owes its existence to [the speaker's] professional responsibilities.'") (emphases and insertion in original) (citations omitted).  Plaintiff may not have spoken to the media before, but he spoke to the media at the direct request of his supervisors.  As in *Weisbarth*, here, Plaintiff's employer asked him to speak to the media, which he did.  Defendants were then allegedly displeased with his speech and allegedly disciplined him because of the speech.  As in *Weisbarth*, that discipline does not violate the First Amendment.  While, as the Sixth Circuit has pointed out, the result may be unfair or illogical, it does not violate Plaintiff's First Amendment constitutional rights.

17

Plaintiff fails to state a First Amendment claim of retaliation because his complaint shows that he cannot establish that he was speaking as a private citizen.

### 2. Plaintiff fails to allege an adverse action as he voluntarily retired and his allegations do not create an issue of constructive discharge

Defendants also argue that the Court must dismiss Plaintiff's First Amendment retaliation claim because the alleged disciplinary actions that he suffered and his retiring cannot constitute an adverse action as a matter of law.  (Defs.' Mot. at 8.)

An adverse action is an action "that would deter a person of ordinary firmness from continuing to engage in that conduct." *Handy-Clay*, 695 F.3d at 545 (citation omitted).  The term "adverse action" has "traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote."  *Id.* (internal quotation marks, citations, and brackets removed).  The Sixth Circuit has also held that "losing one's job and accompanying benefits is certainly severe enough to deter a person of ordinary firmness from speaking at public meetings."  *Id.* (citations and brackets omitted).

Plaintiff argues that his September 8, 2011 and December 9, 2011 disciplinary write-ups, Defendant Jansen's statement that the next time Plaintiff would be disciplined that he would be fired, and his retirement evidences a constructive discharge, which is an adverse action for retaliation purposes.

Defendants point out that Plaintiff's first alleged discipline, on September 8, 2011, occurred before his allegedly protected speech, and therefore cannot logically or legally factor into the Court's adverse action analysis of First Amendment retaliation.  (Pl.'s Mot. at 9, n. 5.)  Defendants then state that Plaintiff only received an oral reprimand on December 9, 2011, and that that one verbal reprimand is not an adverse action.  (Defs.'

18

Mot. at 9.)  Defendants point to *Pines v. Boards of Regents of Univ. of Mich.*, 10-15106, 2012 WL 380242, at *8 (E.D.Mich. Feb. 6, 2012) (Cohn, J.).  There, the court held that the plaintiff could not establish the adverse action element in a prima facie case of retaliation when he suffered one written warning, received a written counseling regarding performance improvement, received a letter requesting medical documentation, and was placed on medical leave.  *Id.*  The court held that "reasonable minds could not differ that these events are insufficient to dissuade a reasonable employee from making a charge of discrimination."  *Id.*  The court stated that the events "do not constitute adverse employment acts."  *Id.*  *See Ford v. Hamilton County Juvenile Court*, 05-557, 2007 WL 2302816 (S.D.Ohio Aug. 8, 2007) (addressing and distinguishing Sixth Circuit case law suggesting that the threats of discharge have to be real, and cannot be made by someone who is not in the position to terminate the plaintiff.)  *See also*, *Pozsgai v. Ravenna City Schs. Bd. of Educ.*, 10-2228, 2012 WL 1110013, at *7 (N.D.Ohio Mar. 30, 2012) ("a threat to discharge is not an adverse employment action.") (citation omitted).  The Sixth Circuit has additionally held that "threats to discharge or discipline" are "not [] adverse employment action[s]."  *Flautz v. Potter*, 156 F.App'x 812, 817 (6th Cir. 2005) (citation omitted).  The disciplinary actions and threats to discharge by themselves are not adverse actions.

Plaintiff appears to agree and states that "[t]he disciplinary actions which Plaintiff was subjected to in and of themselves are not considered adverse employment actions." (Pl.'s Resp. at 11.)  What he states, though, is that Defendants were "setting [Plaintiff] up to fire him[.]"  *Id.*  He argues that the events leading up to his retirement and his retirement constitute a constructive discharge, which, he asserts, is an adverse action.  (Pl.'s Resp. at 12.)  Plaintiff points to *Regan v. Faurecia Auto Seating, Inc.*, 679 F.3d 475 (6th Cir.

19

2012), to support his position.  (*Id.*)   *Regan* does support Plaintiff's argument that constructive discharge would constitute an adverse action.  679 F.3d at 482.  In the Sixth Circuit

> [a] constructive discharge requires a determination that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

*Ross v. Pfizer, Inc.*, 375 F.App'x 450, 457 (6th Cir. 2010)  The Sixth Circuit has adopted the following to determine "whether a work environment rises to the level of compelling an employee to leave:"

> Whether a reasonable person would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable that the employee's former status.

*Id.* (citation omitted).

Plaintiff alleges that his retirement evidences constructive discharge.  In most circumstances, though, "[e]mployee resignations and retirements are presumed to be voluntary."  *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004) (citation omitted).  "An apparently voluntary resignation does not rise to the level of constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances."  *Id.* (citation omitted).  "If an employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was deprived of his due process rights."  *Id.* (citation omitted).

20

"There are two circumstances in which an employee's resignation will be deemed involuntary for due process purposes: 1) when the employer forces the resignation or retirement by coercion or duress, or 2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee." *Nunn,* 113 F. App'x at 60.

Plaintiff can only assert that Defendants forced his retirement by coercion or duress. But here, there are no allegations of coercion or duress. Plaintiff fails to state a claim that his retirement fell into either of these circumstances. Plaintiff argues that he was ordered to report to Defendants Jansen and Jarrett's office on January 30, 2012 and he would be fired. (Pl.'s Resp. at 11.) He states that "[r]ather than subject himself to the embarrassment and humiliation of being fired after 25 years of service for reasons which were fabricated in the first place constitutes an adverse employment action," he retired. (*Id.*) Plaintiff maintains that he has "presented evidence that he was faced with the loss of his job and all income or run to the retirement office and put in for his retirement before [] Defendants could take any adverse disciplinary action against him which would culminate in his termination of employment and his inability to apply for his pension." (*Id.* at 12.)

Defendants point to *Scott v. Goodyear Tire & Rubber Co.*, 160 F.2d 1121, 1128 (6th Cir. 1998) to support their argument that Plaintiff's allegations that his retirement was voluntary and does not allege a constructive discharge argument.

In *Scott*, the plaintiff argued that his company constructively discharged him when it eliminated his position while the company was undergoing a restructuring and offered him early retirement instead of redeployment to a comparable position within the company. 160 F.3d at 1123. The plaintiff had been with the defendant company for 41 years before the

21

restructuring. *Id.* at 1124. As the restructuring was taking place, a human resource employee told the plaintiff that his position was being eliminated. *Id.* The human resource employee presented the plaintiff with three options: (1) accept layoff status and receive no benefits at all and no possibility of recall; (2) accept layoff status, receive supplemental unemployment compensation benefits on a regular basis and remain under consideration for recall to a new position, if such a position became available at a later date; or (3) opt for retirement and receive a lump sum payment as well as monthly retirement checks and continued health benefits into retirement. *Id.* The plaintiff chose retirement. *Id.*

The Sixth Circuit held that the choices presented to the plaintiff could be construed as constructive termination and that the plaintiff had presented sufficient evidence of discriminatory intent for his age discrimination claim. *Scott*, 160 F.3d at 1126. The court discussed the constructive discharge theory. *Id.* at 1127. The court stated that "[i]n the typical discriminatory constructive discharge case, the employer does not overtly seek a discontinuation in the employment relationship but the employee claims to be subjected to intolerable working conditions due to discriminatory behavior." *Id.* (citation omitted). The court noted that the plaintiff presented a different case because he was actually presented with a "choice between voluntary and involuntary retirement." *Id.* The court reviewed Sixth Circuit case law, and stated that "a mere allegation that improper motives led an employer to offer early retirement benefits is insufficient to prove that the employee who accepted those benefits was constructively discharged." *Id.* (citation omitted).

The court also reviewed another Sixth Circuit case that found that the plaintiff did not present enough evidence of age discrimination in an offer of retirement context, *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510 (6th Cir. 1991). In *Wilson*, the 51 year old

22

plaintiff alleged that he was constructively discharged when he was forced into retirement when his company was downsizing.  932 F.2d at 512.  The company told the plaintiff that it was going to eliminate his position and then offered several options to the plaintiff: (1) displacing any of the people he directly and immediately supervised; (2) accepting another open position; (3) applying for subsequent open positions for the following two years; and (4) opting to retire from the company and accept a severance package which included pension benefits, lifetime health care and two weeks of pay for each of his 33 years of service with the company.  *Id.* at 513.  The plaintiff alleged he had not been told about the salary reduction that was involved with the first three options.  *Id.*  The plaintiff alleged age discrimination claims.  *Id.*  He argued that he was constructively discharged.  *Id.* at 515. The Sixth Circuit disagreed.  *Id.*  It found that the plaintiff offered no evidence of discharge and found that "[t]he presentation to him of other legitimate options for continued employment with the company, even in less prestigious positions, precludes a finding that he was constructively discharged. A demotion within a company does not amount to a constructive discharge unless the proffered employment options would have been 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Id.* (citation omitted).  The Sixth Circuit noted that "[n]o one" at the company "forced or encouraged [the plaintiff] to select the early retirement option, and there is no indication that [the company] intended to make [the plaintiff's] working conditions unpleasant had he stayed."  *Id.*

The difference between *Scott* and this case is that Plaintiff made the voluntary decision to retire.  In his complaint, he alleges that Defendants told him "that he could be terminated if he received additional discipline." (Am. Compl. ¶ 19.)  No certainty of

termination exists in that statement. *See Adams v. Lucent Technologies, Inc.*, 284 F.App'x 296, 302 (6th Cir. 2008) (stating that the plaintiffs could not prove constructive discharge when they "were not certain to lose their jobs and did not accept [the special voluntary offer] as an alternative to layoff status.") Here, Plaintiff had a prospect of employment. There was no certainty as to his termination, and he does not allege so. *See Johnson v. Rumsfeld*, 238 F.App'x 105, 109 (6th Cir. 2007) ("We have also held that choosing retirement when there was 'no definite prospect of continued employment with the company' constitutes constructive discharge.") (quoting *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1128 (6th Cir. 1998). Here, even accepting the fact that Plaintiff "could" be terminated, as he stated, with another discipline, that fact is too speculative to raise a right to relief. Plaintiff, in his response, changes the "could" to a "would," in the relevant statement above. (Pl.'s Resp. at 15.) Plaintiff then represents that he, "instead of attending a disciplinary hearing, went to the retirement board and ended his career with Wayne County." (*Id.* at 15-16.) Plaintiff had a choice. He could have attended a disciplinary hearing. Instead, he chose to retire. He cannot state an adverse action occurred.

Plaintiff therefore cannot sustain his First Amendment cause of action.

### B. Michigan Whistleblowers' Protection Act

Defendants argue that Plaintiff's claim fails to state a WPA violation because Plaintiff voluntarily retired and his verified complaint shows that he cannot establish an adverse employment action. (Defs.' Mot. at v.) Defendants further argue that Plaintiff's claim fails because, "even assuming arguendo that his retirement was a constructive discharge, [his] retirement was allegedly caused by events unrelated to his [WPA] claim[.]" (*Id.*)

24

Michigan's WPA "was enacted to encourage employees to assist in law enforcement and to protect employees who participate in whistleblowing activities." *Springsteen v. Garrett*, __F.Supp.2d __, 2012 WL 3248239, at *13 (E.D.Mich. Aug. 8, 2012) (Duggan, J.) (citation omitted).  The statute provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law . . . unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362.

To sustain a claim under the WPA, a plaintiff must first establish a prima facie case by showing that: (1) he engaged in activity under the WPA; (2) he was discharged, and (3) a causal connection existed between the protected activity and the discharge. *Springsteen*, 2012 WL 3248239, at * 13 (citation omitted).  If a plaintiff establishes a prima facie case, then the burden shifts to the defendant to articulate a legitimate reason for the discharge. *Id.* (citation omitted). And if the defendant brings forth that reason, then the plaintiff may prevail by proving that the offered reason was pretext for the discharge.  *Id.* (citation omitted).

Defendants argue that Plaintiff cannot show that he was discharged and cannot show causation.[3]

---

[3]Defendants argue that Plaintiff's third discipline, based upon his WPA at the January 26, 2012, is insufficient to establish causation for the WPA claim because Plaintiff alleges that the first two disciplines also contributed to the constructive discharge.  (Defs.' Mot. at 13-14.)  Because the Court finds the adverse action prong dispositive, the Court does not address the causation issue.

Plaintiff again argues that his retirement evidences a constructive discharge. The Court has already addressed this argument in the section above. The Court's analysis is equally applicable here. The Court therefore finds that Plaintiff cannot establish a constructive discharge. His WPA claim fails.[4]

### C.      Civil conspiracy

Defendants argue that Plaintiff's civil conspiracy claim fails as a matter of law because Plaintiff has failed to plead a separate, actionable tort underlying the alleged conspiracy. (Defs.' Mot. at v.) Defendants alternatively argue that the intra-corporate conspiracy doctrine and governmental immunity bar the civil conspiracy claim. The Court

---

[4]The Court's decision would not change if the Court presented an exhaustive analysis of Michigan WPA law. The constructive discharge analysis would be the same. In Michigan, "[a] constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Swystun v. Farmington Sch. Dist.*, 235812, 2003 WL 458686, at * 2 (Mich.Ct.App. Feb. 21, 2003) (citation omitted). "Constructive discharge is not a cause of action but 'a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily.'" *Id.* (citation omitted). A plaintiff must therefore "first establish the requisite statutory harassment before a claim of additional aggravating circumstances is considered." *Id.* (citation and ellipsis omitted). "[A] finding of harassment is a 'necessary predicate' to [a] plaintiff's claim of constructive discharge." *Id.* (citation omitted). *See Day v. Graybar Elec. Co., Inc.*, 265696, 2006 WL 1330106, at *2 (Mich.Ct..App. May 16, 2006)(finding that, when the defendants did not suggest or imply that plaintiff should retire and the plaintiff voluntarily retired, that she could not support a claim of constructive discharge.). *See also Jones v. City of Detroit*, 196581, 1998 WL 1992792, at *1 (Mich.Ct.App. May 5, 1998) (holding that the plaintiff could not create an issue of fact as to constructive discharge when he only had the subjective belief that he would not receive a fair assessment and consequently voluntarily retired before the assessment). *See also Manning v. City of Hazel Park*, 509 N.W.2d 874 (Mich.Ct.App. 1993) (finding first that the plaintiff had established a prima facie case of discrimination and then holding that, under the circumstances, a reasonable juror could conclude that the plaintiff was forced to retire because, if she were discharged, her benefits and pension would have been affected.). In *Manning*, the employer told the plaintiff that she had to "resign, retire, or face immediate removal. *Id.* at 876. Plaintiff again has not made allegations that support his position that he faced imminent termination. He therefore cannot sustain a claim of constructive discharge.

finds that the intra-corporate conspiracy doctrine is dispositive and does not address the governmental immunity claim.  Plaintiff additionally, in his response, states that he desires to voluntarily dismiss without prejudice the conspiracy claim.  The Court dismisses the claim with prejudice, as discussed below.

"A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful actions.  It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983.  To prevail on a civil conspiracy claim, a plaintiff must show that (1) a single plan existed, (2) the defendants shared in the general conspiratorial objective to deprive plaintiff of his constitutional or federal statutory rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff."  *Trans Rail Am., Inc. v. Hubbard Twp.*, 478 F.App'x 986, 988 (6th Cir. 2012) (all citations and quotations marks omitted).

Defendants argue that the intra-corporate conspiracy doctrine bars Plaintiff's civil conspiracy claim.  (Defs.' Mot. at 18, n. 20.)

The Sixth Circuit has adopted the intra-corporate conspiracy doctrine in civil rights cases.  *Upton v. City of Royal Oak*, 10-2304, 2012 WL 1662024, at *11-12 (6th Cir. May 11, 2012).  The court has stated:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Id.* at *11 (citation omitted).   In *Upton*, the Sixth Circuit affirmed the district court's statement that, "[w]here all of the defendants are members of the same collective entity,

27

the law does not recognize the existence of two separate 'people' to form a conspiracy.'" *Id.* at *12 (citation omitted) (affirming the dismissal where all the defendants were employees or agents of the defendant.).

Here, as Defendants point out, Plaintiff alleges that all of the defendants were employees/agents of the Defendant Wayne County up through the time of Plaintiff's retirement. (Defs.' Mo. at 18, n. 20.)   Defendants maintain that the intra-corporate conspiracy doctrine bars Plaintiff's civil conspiracy claim.  (*Id.*)

In his response, Plaintiff states that he "voluntarily dismisses without prejudice his allegation in Count III of his Verified Complaint."  (Pl.'s Resp. at 21.)

Defendants argue that the response was the first time Plaintiff had informed them that he wanted to dismiss the civil conspiracy claim.  (Defs.' Reply at 6.)  They argue that dismissal without prejudice is not warranted.  (*Id.*)

The Court agrees with Defendants, both with their intra-corporate conspiracy argument and the dismissal with prejudice issue.  Here, Plaintiff is suing Defendants in their official capacities.  They are all members of the same collective entity.  They therefore cannot form a conspiracy, following from the intra-corporate conspiracy.  While Plaintiff alleges a claim against Defendant Grundy in his personal capacity, there is nothing in Plaintiff's complaint in which the Court could conclude that he was acting not as the corporation, even if improperly so.  The Court finds dismissal of this claim with prejudice against Defendants and Defendant Grundy in his personal capacity appropriate.

## IV.   Conclusion

For the above-stated reasons, the Court GRANTS Defendants and Defendant Grundy's motions to dismiss/judgment on the pleadings.[5]

So ordered.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  March 14, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 14, 2013, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

---

[5]Defendant Grundy argues on his own behalf that he was not employed by Wayne County on the alleged First Amendment and WPA violation claims and that those claims must fail against him for that reason.  Plaintiff has not responded to Defendant Grundy's motion to dismiss. He then argues that the civil conspiracy claim against him is barred by the intra-corporate conspiracy doctrine.  The Court finds Defendant Grundy's arguments compelling.  For the reasons stated above, though, the Court dismisses Plaintiff's complaint and does not specifically address Defendant Grundy's motion.